Jessica Rosen, SBN 294923
jrosen@lewitthackman.com
Heidy Nurinda, SBN 333188
hnurinda@lewitthackman.com
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
16633 Ventura Boulevard, 11th Floor
Encino, California 91436-1865
Phone: (818) 990-2120; Fax: (818) 981-4764

Erin C. Johnson, Esq. (*Pro hac vice* application pending)
ecjohnsen@garnerlegal.com
GARNER, GINSBURG & JOHNSEN, P.A.
333 Washington Ave. N., Suite 300
Minneapolis, MN 55401
(612) 259-4800 (Telephone)
(612) 259-4810 (Facsimile)

Attorneys for Plaintiffs,
Creeps, Inc. and Jessica Trujillo

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CREEPS, INC., a California corporation; and JESSICA TRUJILLO, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>SPIRIT HALLOWEEN SUPERSTORES LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 24-cv-2325<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Creeps, Inc. and Jessica Trujillo (collectively, "Trujillo") by their attorneys, for their complaint against Defendant Spirit Halloween Superstores LLC ("Spirit") allege and aver as follows:

**Background**

1. This is an action by a former operator of a Spirit Halloween business against Spirit for violation of the California Franchise Relations Act, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. In brief, Defendant entered into consignment agreements with Trujillo, pursuant to which Trujillo leased and outfitted spaces for seasonal Spirit Halloween retail businesses, invested substantial amounts of money into operating her business, and created goodwill for the Spirit Halloween name in her territories, over a period of more than a decade.

2. Despite Trujillo being a strong performer within the Spirit Halloween system, Spirit unilaterally terminated her consignment agreement. Spirit conducted this termination in bad faith, by terminating Trujillo's agreements after requiring her to invest in fixtures and storage for her business for the following season. Further, Spirit was clear that it was conducting the termination in order to take back Trujillo's markets for itself, because this would be more profitable for Spirit.

3. Furthermore, Defendant purported to structure the parties' relationship as a "consignment" relationship, when in fact it was a franchise relationship. As such, Spirit Halloween terminated the consignment agreement in violation of California franchise law, which requires prior notice, good cause for termination and an opportunity to cure, none of which were provided to Trujillo.

**Jurisdiction and Venue**

4. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial number of the acts and transactions giving rise to the claims herein occurred within this district.

6. This Court has personal jurisdiction over Spirit by reason of Spirit's transaction of business within the state, both by transacting business with Trujillo since 2005 and by operating its own Spirit Halloween stores within the State.

### Parties

7. Jessica Trujillo is a citizen and resident of Apple Valley, California.

8. Creeps, Inc. is a California corporation with its principal place of business in Apple Valley, California. Jessica Trujillo is the sole shareholder of Creeps, Inc.

9. Spirit Halloween Superstores, LLC is a Delaware limited liability company, with its principal place of business in Egg Harbor Township, New Jersey. Spirit is wholly owned by Spencer Spirit IH LLC, a Delaware limited liability company, which is in turn wholly owned by Spencer Spirit Holdings, Inc, a Delaware Corporation with its principal place of business in Egg Harbor Township, New Jersey.

### Facts

10. Trujillo's relationship with Spirit began in 2005. During her tenure as an operator, Trujillo operated two stores each Halloween season in California, unless specifically agreed otherwise by Trujillo and Spirit.

11. When Trujillo entered into her business relationship with Spirit, she signed an agreement styled as a "consignment agreement." In order to become a consignment operator, Trujillo had to pay a security deposit to Spirit for the right to operate in her territories.

12. Pursuant to the consignment agreements with Spirit, Trujillo operated retail stores under the "Spirit Halloween" marks during the Halloween season. Under the Spirit model, the businesses did not necessarily operate from the same location every season—because these were not year-round businesses, and instead operated under a pop-up model. Each year Trujillo would identify, build out (if necessary), and outfit locations for her business only for the Halloween season.

13. Spirit had significant say over all aspects of Trujillo's business—from location selection and approval to advertising and marketing, to merchandise sold, to the layout of the stores—Trujillo was required to comply at all times with Spirit's system and specifications.

14. Preparation for one season would begin as early as November of the preceding year, when Spirit would ask Trujillo to place orders for fixtures to be used in her stores the following year. Trujillo also committed each year to storage facility leases to store fixtures for their businesses during the off season.

15. Spirit provided each year's merchandise to Trujillo on a consignment basis, with unsold merchandise being returned to Spirit at the end of each season. At the end of each season, an inventory of unsold merchandise was conducted by Trujillo and an independent inventory service selected by Spirit.

16. During the course of their relationships, Trujillo also paid mark ups and "service fees" to Spirit on required expenditures such as signage, fixtures, rent, and in-store experiences.

17. Spirit regularly assured Trujillo that their relationship would continue pursuant to the automatic renewal provision in the Consignment Agreements. For example, at an in-person kickoff meeting in 2015 Mary Lou Casto and Ann Sullivan, Consignment Directors for Spirit, told Trujillo and other operators in attendance that as long as they performed under their agreements, they had nothing to be worried about—that is, that Spirit would only consider terminating operators if they breached their consignment agreements. This representation was made to make operators feel comfortable with Spirit's new requirement that they invest in expensive snap walls for their retail locations. In fact, Ms. Casto went so far as to tell Trujillo and the other attendees that the written agreements were in place so Spirit could protect itself in the event that, for example, one of them were to win the lottery and abandon their Spirit businesses.

18. These representations of safety for consignment operators continued until just before the time of the termination of Trujillo's consignment agreement. After a massively successful Halloween season in 2021, during a wrap-up call in November open to all operators in the Spirit system, George Sotirin, Vice President of Operations of Spirit, told operators that Spirit had just become a billion-dollar company and couldn't do it without the consignment operators. During this call, Mr. Sotirin said that as long as they did not breach their agreements, they would continue as operators.

19. Trujillo relied on these and other reassurances as she invested significantly into building her markets and generating goodwill for the Spirit brand, and trusted Spirit that their relationship would continue as long as she continued to perform under her agreements.

20. Such reliance was supported by the fact that her agreements with Spirit automatically renewed without issue for many years.

21. Throughout her relationship with Spirit, Trujillo expended significant time and money to build recognition and goodwill associated with the Spirit Halloween brand in her territories. As a result of these efforts, Trujillo's stores performed very well—in each of 2020 and 2021, one of Trujillo's stores surpassed $1 million in sales. In 2021, her second store was just shy of hitting the $1 million sales mark. For hitting this milestone, Spirit promised to send Trujillo an orange blazer—this was used as a symbol for successful operators, and Spirit made a show of praising those operators receiving orange blazers (or blazer pins for subsequent high-performing years) at its annual conference each year. Trujillo expected to receive this blazer, and a pin, at the 2022 annual conference.

22. In late October 2021, Spirit emailed Trujillo, asking her to place an order for snap wall kits for the 2022 season. Trujillo, therefore, began usual preparations for the 2022 season, ordering new fixtures and committing to storage for existing fixtures during the off season.

23. On November 10, 2021, Spirit held a Zoom meeting with its operators, with Steven Silverstein, Chief Executive Officer of Spirit, and George Sotirin. During this call, Spirit praised and thanked its operators, and promised that they had "great expectations for the coming 2022 season for Spirit partnerships." Accordingly, Trujillo looked forward to the 2022 season, ordering racks, committing to storage for fixtures during the off season, and otherwise continuing to plan and make commitments accordingly.

24. Despite the above representations, Trujillo received a phone call from Ann Sullivan, Senior Director of Operations at Spirit, and Tim Viechec Vice President of Operations at Spirit, on January 11, 2022, during which Ms. Sullivan informed Trujillo that her agreement was being terminated. Ms. Sullivan further said that Trujillo had "done nothing wrong as a consignment operator," and instead that said she had been a "Class A operator." Ms. Sullivan told Trujillo that the termination decision had been made by Spirit's real estate team, and that because there were no longer any consignment stores south of Trujillo's territory, it "behooved" Spirit to take Trujillo's territory for itself.

25. Spirit then sent a termination letter to Trujillo dated January 13, 2022, less than 30 days before the end of her consignment agreement year, stating simply that "Spirit has elected to terminate the Consignment Agreement effective January 30, 2022." Spirit did not claim to have any cause for terminating the agreement with Trujillo, did not provide her with an opportunity to cure any defaults to the extent these did exist, and did not give her an opportunity to sell the business.

26. After consulting with counsel, Trujillo learned that her consignment relationship with Spirit constituted a franchise relationship under the California Franchise Relations Act.

27. As a result of the Defendants' termination, Trujillo has lost the value of her business, an amount in excess of $4.5 million.

# FIRST CLAIM FOR RELIEF

## (Violation of the California Franchise Relations Act (Termination))

28. Trujillo repeats and realleges all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

29. The arrangement between Trujillo and Spirit was a "franchise" as that term is defined in the California Franchise Relations Act ("CFRA"), Cal. Bus. & Prof. Code § 20001.

30. The CFRA defines "Franchise" as: "a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which: (a) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and (b) The operation of the franchisee's business pursuant to that plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and (c) The franchisee is required to pay, directly or indirectly, a franchise fee." Cal. Bus. & Prof. Code § 20001.

31. Trujillo's relationship with Spirit satisfies the definition of a franchise because Trujillo: a) operated her businesses pursuant to the requirements of Spirit, who prescribed details such as location, advertising and marketing, specific merchandise sold, and store layout, therefore satisfying the requirement that the franchisee operate pursuant to the franchisor's marketing plan or system; b) was granted a license, pursuant to her consignment agreement, to operate under the "Spirit Halloween" marks, satisfying the trademark license requirement; and c) paid a deposit, mark ups, and "service fees" to Spirit on required expenditures such as signage, fixtures, rent, and in-store experiences that qualify as franchise fees for the purposes of the CFRA.

32. Trujillo is a California resident and her Spirit locations were in California. As such, the California Franchise Relations Act applies to her relationship with Spirit. The CFRA prohibits termination or nonrenewal absent good cause.

33. In violation of the CFRA, Spirit terminated Trujillo's franchise without cause. In fact, Spirit was forthright that the termination of Trujillo's agreement was because it desired to take back her territories for itself to increase its profits, rather than continuing to allow the territory to operate through Trujillo.

34. As a result of Spirit's violation of the CFRA, Trujillo is entitled to recover the fair market value of the franchised business and franchise assets and any other damages caused by Spirit's termination.

## SECOND CLAIM FOR RELIEF

**(Violation of the California Franchise Relations Act (Non-renewal))**

35. Trujillo repeats and realleges all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

36. As outlined above, the arrangement between Trujillo and Spirit was a "franchise" as that term is defined in the California Franchise Relations Act ("CFRA"), Cal. Bus. & Prof. Code § 20001.

37. Trujillo is a California resident and her Spirit locations were in California. As such, the California Franchise Relations Act applies to her relationship with Spirit.

38. To the extent that the termination of Trujillo's franchise can be considered a non-renewal, Spirit violated the CFRA by failing to renew Trujillo's franchise without first providing at least 180 days prior written notice of its intention not to renew and giving Trujillo the opportunity during that time to sell their business to a purchaser.

39. As a result of Spirit's violation of the CFRA, Trujillo is entitled to recover the fair market value of the franchised business and franchise assets and any other damages caused by Spirit's unlawful non-renewal.

## THIRD CLAIM FOR RELIEF

**(Breach of the Covenant of Good Faith and Fair Dealing (Termination))**

40. Trujillo repeats and realleges all of the allegations set forth above as though fully set forth herein.

41. Through its employees' words and actions, Spirit created an expectation that it would continue to renew Trujillo's consignment agreement so long as she remained in compliance with those agreements.

42. Trujillo invested significant time, energy, and resources into growing her markets and generating goodwill for the Spirit brand in expectation of continuing her relationship with Spirit.

43. Trujillo remained in full compliance with her Agreement, and never received any default notices or complaints of default from Spirit.

44. Spirit has breached the implied covenant of good faith and fair dealing by terminating Trujillo's consignment agreement in bad faith in order to take back her territories for itself precisely at a time when Spirit expects those territories to become significantly more profitable. In doing so, it undermined Trujillo's legitimate expectation that the Parties' relationships would continue so long as she complied with her agreements.

45. Spirit also acted in bad faith by withholding its plans to terminate the consignment agreement while encouraging Trujillo to invest in preparations for the following Halloween season.

46. As a result of Spirit's conduct, Plaintiffs have suffered, and are entitled to recover, damages.

## FOURTH CLAIM FOR RELIEF

**(Breach of the Covenant of Good Faith and Fair Dealing (Non-Renewal))**

47. Trujillo repeats and realleges all of the allegations set forth above as though fully set forth herein.

48. To the extent that the termination of Trujillo's business can be considered a non-renewal, Spirit has breached the implied covenant of good faith and fair dealing by refusing to renew Trujillo's consignment agreement in bad faith. Prior to the non-renewal, Spirit continually reassured her that her agreement would automatically renew as long as she did not breach her agreements. Spirit also encouraged Trujillo to continue investing in her business for the upcoming Halloween season before non-renewing her agreement, while withholding its plans not to renew her agreement.

49. Spirit exercised its discretion unfairly to non-renew Trujillo's relationship in order to take back her territories for itself precisely at times when Spirit expected those territories to become significantly more profitable. By doing so, Spirit deprived Trujillo of her reasonable expectation of a continued relationship.

50. As a result of Spirit's conduct, Trujillo has suffered, and is entitled to recover, damages.

**FIFTH CLAIM FOR RELIEF**

**(Promissory Estoppel (Non-renewal))**

51. Trujillo repeats and realleges all of the allegations set forth above as though fully set forth herein.

52. As detailed above, Spirit repeatedly made clear and definite oral and written promises to Trujillo that it would renew the consignment agreements.

53. Spirit made the promises with the expectation that Trujillo would rely on the promises, and in fact required Trujillo to purchase snap walls and other equipment in expectation of renewal.

54. Spirit was in a position and able to fully perform, fulfill, and carry out the terms and conditions of the promise it made to Plaintiffs by renewing the consignment agreement.

55. Trujillo reasonably relied to her detriment on Spirit's promise. Specifically, she purchased equipment, entered into storage contracts, and otherwise prepared her business to reopen.

56. As a result of Trujillo's reliance on Spirit's promises, Trujillo sustained definite and substantial damages. Specifically, she incurred costs for equipment, storage, and other expenses that she would not have incurred had she known Defendant did not intend to renew her agreement.

## SIXTH CLAIM FOR RELIEF

**(Promissory Estoppel (Termination))**

57. Trujillo repeats and realleges all of the allegations set forth above as though fully set forth herein.

58. As detailed above, Spirit repeatedly made clear and definite oral and written promises to Truillo that it would not terminate the consignment agreement so long as she was in compliance with the agreement.

59. Spirit made the promises with the expectation that Trujillo would rely on such promises, and in fact required her to purchase snap walls and other equipment in expectation that the business would continue the next year.

60. Spirit was in a position and able to fully perform, fulfill, and carry out the terms and conditions of the promise it made to Trujillo by not terminating the consignment agreement.

61. Trujillo reasonably relied to her detriment on Spirit's promise. Specifically, she purchased equipment, entered into storage contracts, and otherwise prepared her businesses to reopen.

62. As a result of her reliance on Spirit's promises, Trujillo sustained definite and substantial damages. Specifically, she incurred costs for equipment, storage, and other expenses that she would not have incurred had she known Spirit did not intend to renew her agreement.

## SEVENTH CLAIM FOR RELIEF

## (Unfair, Unlawful, and Fraudulent Business Practices

## Violations of Cal. Bus. & Prof. Code §17200, *et seq.*)

63. Trujillo repeats and realleges all of the allegations set forth above as though fully set forth herein.

64. Spirit's acts are a continuing and ongoing unfair, unlawful, and/or fraudulent activity prohibited by the Unfair Competition Law ("UCL") and justify injunctive relief, restitution, and other equitable relief pursuant to Cal. Bus. & Prof. Code § 17203.

65. The UCL provides: "Unfair competition shall mean and include unlawful, unfair, or fraudulent business practices and unfair, deceptive, untrue or misleading advertising…"

66. Spirit exploited its position of power over Trujillo to commit the acts and misconduct alleged above, which are unfair, unlawful, and/or fraudulent business acts and practices within the meaning of California Business and Professions Code §§ 17200 *et seq.*, including, but not limited to, violations of CFRA (Cal. Bus. & Prof. Code § 20001 *et seq.*).

67. As a result, Trujillo suffered and continues to incur costs and fees associated with Spirit's unfair, unlawful, and/or fraudulent business practices.

68. Spirit's course of conduct, act(s), and practice(s) constitute separate and independent unfair, unlawful, and/or fraudulent business practices and violations of Cal. Bus. and Prof. Code § 17200 et seq.

69. Pursuant to Cal. Bus. and Prof. Code § 17200, et seq., Spirit and all persons in concert with Spirt should be enjoined and restrained, temporarily, preliminarily and permanently, prohibitorily and mandatorily from engaging in all forms of unfair, unlawful, and/or fraudulent business acts and practices, including violations of CFRA.

WHEREFORE, Plaintiffs respectfully request that this Court grant the

Plaintiffs' damages in an amount to be determined at trial but in no event less than $4,500,000 plus interest, costs, and attorneys' fees and all such other relief the Court may deem just and proper.

Dated: October 31, 2024

GARNER, GINSBURG & JOHNSEN, P.A.
Erin Conway Johnson

&

LEWITT, HACKMAN, SHAPIRO, MARSHALL & HARLAN

By: /s/ Jessica Rosen
Jessica W. Rosen

Attorneys for Plaintiffs,
Creeps, Inc. and Jessica Trujillo

## JURY DEMAND

Plaintiffs demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure as to all issues or claims for which a jury trial is allowed.

Dated: October 31, 2024

GARNER, GINSBURG & JOHNSEN, P.A.
Erin Conway Johnson

&

LEWITT, HACKMAN, SHAPIRO, MARSHALL & HARLAN

By: /s/ Jessica Rosen
Jessica W. Rosen

Attorneys for Plaintiffs,
Creeps, Inc. and Jessica Trujillo